J-S16016-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.T.S., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2850 EDA 2022 |

Appeal from the Decree Entered October 13, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at CP-51-AP-0000224-2021

| | | |
|---|---|---|
| IN THE INTEREST OF: E.R.U.F., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2851 EDA 2022 |

Appeal from the Decree Entered October 13, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at CP-51-AP-0000047-2022

| | | |
|---|---|---|
| IN THE INTEREST OF: Z.N.G., JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: N.C., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2852 EDA 2022 |

Appeal from the Decree Entered October 13, 2022
In the Court of Common Pleas of Philadelphia County
Juvenile Division at CP-51-AP-0000048-2022

BEFORE:  DUBOW, J., MURRAY, J., and McCAFFERY, J.

MEMORANDUM BY MURRAY, J.:                    **FILED MAY 26, 2023**

N.C., (Mother), appeals from the decrees involuntarily terminating her

parental rights[1] to M.T.S., E.R.U.F. and Z.N.G. (Children).[2]  We affirm.

Mother gave birth to E.R.U.F. in October, 2012; to M.T.S. in March,

2017; and to Z.N.G. in June, 2020.  On August 28, 2018, the Philadelphia

Department of Human Services (DHS) received a report that M.T.S.,

> then one year old, had purple and red bruises on both sides of his
> back and on the back of his upper thigh near his buttock; that …
> Mother, N.C., admitted she had hit [M.T.S.] on his legs, causing
> the bruises; that the Children's maternal grandmother, S.B., with
> whom Mother and the Children were residing, was not present at
> the home during the incident; that the exact date of the incident
> was unknown; that on the morning of August 28, 2018, S.B.
> observed [M.T.S.'s] injuries and instructed Mother not to hit the
> child due to his age; that S.B. did not physically discipline either
> child; and that [M.T.S.] cried when Mother was near him.  The
> report also alleged that Mother had been incarcerated after a
> domestic violence incident involving [M.T.S.'s] Father; that S.B.
> cared for [E.R.U.F.] during Mother's incarceration; that Mother
> gave birth to [M.T.S.] while she was incarcerated; that S.B. had
> cared for [M.T.S.] since his birth; that S.B. had been awarded
> legal custody of [E.R.U.F.] but not [M.T.S.]; that [M.T.S.'s f]ather
> … was incarcerated and uninvolved in [M.T.S.'s] care; that
> [M.T.S.'s f]ather … had obtained a Protection From Abuse (PFA)
> Order against Mother; and that [E.R.U.F.'s f]ather … was not
> involved in her care; that Mother was diagnosed with Bipolar
> Disorder, Attention Deficit Hyperactivity Disorder (ADHD) and
> Mother had expressed suicidal ideations while she was
> incarcerated; that Mother had been recently released from prison
> and enrolled in mental health treatment through Community

---

[1] Mother has appealed from the December 21, 2022 order changing E.R.U.F.'s permanency goal to adoption at 242 EDA 2023.

[2] The trial court terminated the parental rights of Children's fathers.  The fathers of M.T.S. and Z.N.G. have not appealed.  E.F., who is the father of E.R.U.F., has appealed at 243 and 244 EDA 2023.

Behavioral Health (CBH) with the assistance of her prison supervisor and prison social worker from the Release Program; and that Mother had obtained public assistance benefits for [both children] and was planning to enter a shelter. [DHS determined t]he report [of abuse] was indicated.

Trial Court Opinion, 12/20/22, at 3. On September 12, 2018, the trial court adjudicated M.T.S. dependent and placed him with Mother's mother (Grandmother). *Id.* at 6.

Mother has bipolar disorder, schizophrenia, and anger management issues. *Id.* at 4. In 2018, the trial court ordered Mother to participate in various services to address her mental health, parenting, and housing issues. Mother was noncompliant. Consequently, "Mother's visits [with M.T.S. were] suspended [on] 12/18/2018." *Id.* at 9.

The court continued to refer Mother for mental health, parenting, and housing services. On October 23, 2019, the court ordered Mother to participate in supervised visitation with M.T.S. for two hours a week. *Id.* at 9. In June 2020, Mother gave birth to Z.N.G. After DHS visited Mother and Z.N.G. at the hospital, Mother and Z.N.G. were discharged to a women's shelter with "a safety plan signed by shelter staff." *Id.* at 11.

Following a review hearing on July 10, 2020, the court returned M.T.S. to Mother, directed DHS to "implement supervision," and Mother "to continue her mental health treatment and comply with [] safety visits." *Id.* at 12. "Mother was discharged from the shelter on July 31, 2020, due to her lack of

compliance with shelter rules.  Mother and the Children subsequently began residing in an apartment." *Id.*

On September 8, 2020, M.T.S.'s cousin took M.T.S., who was then three years old, to the emergency department of St. Christopher's Hospital.  M.T.S. had numerous bruises, cuts, and abrasions "all over his body," a black eye, and a "left humeral fracture." *Id.* at 13-15.  At the hospital the following day, a DHS representative observed M.T.S. to be "fragile and afraid of Mother." *Id.* at 15.  The hospital Child Protection Team "found the pattern of bruising was the result of being hit with a cord or belt." *Id.* at 14.  The Child Protection Team opined that M.T.S.'s injuries "were highly associated with inflicted trauma." *Id.* at 16.  The "totality of [M.T.S.]'s injuries was diagnostic of child physical abuse, likely on more than one occasion." *Id.*  M.T.S.'s treatment included surgery on his arm. *Id.* at 14.

On September 11, 2020, DHS obtained an order of protective custody for M.T.S.  On September 18, M.T.S. "was placed in a confidential medical foster home … where he currently remains." *Id.* at 19.  On October 2, 2020, DHS "filed urgent dependent petitions" for E.R.U.F. and Z.N.G., who were placed with Grandmother. *Id.* at 19-22.

On October 26, 2020, the Commonwealth charged Mother with crimes involving M.T.S.[3] Mother was released on bail on December 15, 2020; as a condition of release, Mother was to have no contact with M.T.S. *See* Trial Court Opinion, 12/20/22, at 20.

On January 6, 2021, the trial court held a permanency review hearing regarding M.T.S. and a dependency hearing as to E.R.U.F. and Z.N.G. The court entered findings of abuse of M.T.S. and aggravated circumstances against Mother.[4] The court "ordered that no efforts were to be made" to reunify M.T.S. with Mother. *Id.* at 22. The court also adjudicated E.R.U.F. and Z.N.G. dependent. The court ordered "custody of the Children vacated [as] to [Grandmother] and legal custody transferred to DHS and placement in foster care." *Id.* The Children's placements were to remain confidential. The court referred Mother to "an intensive anger management program, to attend

_____

[3] The Commonwealth charged Mother with aggravated assault, simple assault, endangering the welfare of a child and recklessly endangering another person. *See* 18 Pa.C.S.A. §§ 2702, 4304, 2701, and 2705. Mother's case remains active at CP-51-CR-0002490-2021; at this writing, the most recent docket entry is a "status listing" on May 11, 2023. Mother states that "trial is scheduled for May 2023." Mother's Brief at IX.

[4] Aggravated circumstances exist when the "child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent[ ]"). 42 Pa.C.S.A. § 6302.

[a behavioral] consultation evaluation, and to be referred for a parental

capacity evaluation." *Id.*

> From January 6, 2021, to the present, E.[R.U.]F. and Z.N.G. have experienced numerous placement disruptions. E.[R.U.]F. has been in nine different placements and Z.N.G. has been in seven different placements. Various prior foster caregivers for these children have respectively informed the case management team that they are unable to continue to serve as placement resources for the children due to an ongoing pattern of false allegations and complaints, as well as E.[R.U.]F.'s unwillingness to cooperate with foster caregiver rules and redirections.

> From January 6, 2021 to the present: DHS has received at least fourteen (14) reports concerning the wellbeing of the Children in their various confidential foster placements, including four (4) general protective services investigations, eight (8) FYIs, and two (2) supplemental reports, all of which were determined to be invalid.

> From January 6, 2021 to the present, Mother has displayed increasingly unmanageable behaviors. Mother has lodged at least twenty-three (23) complaints and/or grievances concerning the Children's status, various assigned Community Umbrella Agency (CUA) case management staff members, and/or various foster caregivers.

> From January 6, 2021 to the present, there have been numerous instances where Mother has behaved inappropriately in front of the Children at supervised visits and has also refused to accept redirection from DHS and CUA staff.

> From January 6, 2021 to the present, Mother has refused to sign for E.[R.U.]F. to be evaluated to receive individualized mental health treatment, despite numerous requests from DHS and CUA.

Trial Court Opinion, 12/20/22, at 23-24 (record citations omitted).

On April 22, 2021, DHS petitioned for termination of Mother's parental

rights to M.T.S.; DHS petitioned for termination of Mother's parental rights to

E.R.U.F. and Z.N.G. on January 19, 2022. However, on December 16, 2021,

DHS filed emergency motions to address concerns with Mother's supervised visits with E.R.U.F. and Z.N.G.

> DHS noted the Children's next case listing was February 3rd, but averred: (1) the Children experienced significant displacement disruptions due to Mother's increasingly unmanageable behavior; and (2) DHS and [the Community Umbrella Agency,] CUA[,] were unable to effectively re-direct Mother's escalating behavior at supervised visits, and thus unable to ensure the Children's emotional and physical safety. DHS requested virtual visitation between Mother and the Children, as well as permission to authorize that E.[R.U.]F. be referred for trauma therapy.

*Interest of E.F.*, 284 A.3d 956 (Pa. Super. Aug. 30, 2022) (unpublished memorandum at 4) (footnote omitted).

The trial court held a hearing to address the motions on January 25, 2022. DHS presented testimony from three witnesses: Crystal Robinson, the CUA Assistant Program Director; Kasey Roscoe, the former CUA case manager; and Tommy SanMiguel, the former CUA case manager supervisor.

> Following the testimony, **the trial court found Mother posed a grave threat to the Children and "any contact, even supervised, remote contact would be detrimental to their health."** N.T. at 84. The court accordingly suspended all visitation pending further order. The court's written orders also prohibited Mother's remote contact with the children. Permanency Review Orders, 1/25/22, at 2. The court maintained the Children's permanency goals of reunification.
>
> Thereafter, on February 23, 2021, Mother *pro se* filed a timely notice of appeal at each docket, pertaining to each child, along with Pa.R.A.P. 1925(a)(2)(i) concise statements of errors complained of on appeal. This Court *sua sponte* consolidated the two appeals on May 18, 2022.

*Id.* at 6 (footnote omitted, emphasis added).

On appeal, this Court referenced "the undisputed testimony by Ms. Robinson, Ms. Roscoe, and Mr. SanMiguel, that **due to Mother's conduct, continued supervised line of sight/line of hearing visitation was not possible**." *Id.* at 9 (citation to notes of testimony omitted, emphasis added). We Court concluded "the trial court did not abuse its discretion in finding visitation would pose a grave threat to the Children, and thus indefinitely suspending Mother's visitation." *Id.* This Court affirmed the trial court's orders suspending Mother's visitation with E.R.U.F. and Z.N.G.

The case was returned to the trial court, which conducted a termination hearing on October 13, 2022. By decrees entered that day, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), (8) and (b). Mother timely appealed. This Court consolidated the appeals *sua sponte* on December 29, 2022.

Mother presents the following questions for review:

1. Whether the trial court abused its discretion when it involuntarily terminated [M]other's parental rights under the Adoption Act, 23 Pa.C.S.A. § 2511 (a)(1), (a)(2), § 2511 (a)(5), and § 2511 (a)(8)?

   (a) Was there clear and convincing evidence to support the involuntary termination of [M]other's parental rights under § 2511 (a)(1), (a)(2) § 2511 (a)(5), and § 2511 (a)(8)?

2. Whether the trial court abused its discretion, when it terminated [M]other's parental rights pursuant to § 2511(b) which requires the trial court to find that termination would best serve the children's physical and emotional needs and welfare?

> > (a) Was there clear and convincing evidence to support termination under § 2511(b)?

> 3. Whether the trial court violated [M]other's due process rights by (a) failing to grant [M]other's request for a continuance when [M]other advised the court that she was too ill to testify; and (b) refusing to admit into the record the documentation pertaining to [M]other's mental health which were offered by mother's counsel?

Mother's Brief at VII.[5]

> In reviewing Mother's issues,

> our standard of review requires [us to] accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

> As [the Supreme Court] discussed in *In re: R.J.T.*, [9 A.3d 1179, 1190 (Pa. 2010)], there are clear reasons for applying an abuse of discretion standard of review in these cases. [U]nlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead, we must defer to the trial judges so long as the factual findings are supported by

_____

[5] DHS and the Guardian Ad Litem argue that the trial court properly terminated Mother's parental rights. *See* DHS's Brief at 9-28; Guardian Ad Litem's Brief at 16-25.

the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

***In re Adoption of S.P.***, 47 A.3d 817, 826-27 (Pa. 2012) (some citations omitted).

DHS has the burden to prove by clear and convincing evidence that its asserted grounds for termination are valid. ***In re R.N.J.***, 985 A.2d 273, 276 (Pa. Super. 2009). "[T]he standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***Id.*** Under 23 Pa.C.S.A. § 2511, "the court must engage in a bifurcated process prior to terminating parental rights." ***In re L.M.***, 923 A.2d 505, 511 (Pa. Super. 2007). Initially, the focus is on the conduct of the parent pursuant to § 2511(a). ***Id.***

## Section 2511(a)

Mother first challenges the trial court's finding of grounds for termination under Section 2511(a). This Court need only agree "as to any one subsection in order to affirm the termination of parental rights." ***In re A.S.***, 11 A.3d 473, 478 (Pa. Super. 2010). Instantly, we address the second subsection, which provides for termination when a parent's

> repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S.A. § 2511(a)(2).

- 10 -

Section 2511(a)(2) "emphasizes the child's present and future need for 'essential parental care, control or subsistence necessary for his physical or mental well-being.'" *In re E.A.P.*, 944 A.2d 79, 82 (Pa. Super. 2008) (citation omitted). Grounds for termination under subsection (a)(2) are not limited to affirmative misconduct. *Id.* "Where the parent does not exercise reasonable firmness in declining to yield to obstacles, her [parental] rights may be forfeited." *Id.* at 83. Grounds for termination may include acts of refusal as well as incapacity to perform parental duties. *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021). We have long recognized that a parent is required to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities. *In re Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017).

In challenging termination under Section 2511(a)(2), Mother argues the trial court abused its discretion in crediting the testimony of DHS's expert witness, Dr. William Russell, and discrediting the testimony of Mother's expert witness, Dr. Michelle Joy. Mother's Brief at 5-8. Dr. Russell opined that Mother was unable to provide a safe environment for Children. *Id.* at 5 (citation to notes of testimony omitted). Conversely, Dr. Joy opined that Mother "had the present parental capacity to parent at least Z.N.G. and E.N.U.F.," and "had lingering effects from her childhood trauma but no serious mental health diagnosis." *Id.* at 6. Mother asserts "the trial court's refusal

to find [Mother's] expert credible was unreasonable, not supported by the record and was an abuse of discretion." *Id.* at 7-8. We disagree.

Dr. Russell is a psychologist who is an "expert in the area of parental capacity evaluations." Trial Court Opinion, 12/20/22, at 44. Dr. Russell "conducted two interviews and tested Mother using the Minnesota Multiphasic Inventory, second version, which he stated was the most widely used psychometric instrument in the world." *Id.* at 44-45 (citation to notes of testimony omitted). The trial court detailed Dr. Russell's testimony. *See id.* at 44-48. The court relayed: "Based on his assessment of Mother, Dr. Russell opined to a reasonable degree of psychological certainty that Mother was unable to provide a safe environment for Children." *Id.* at 45.

Dr. Joy, who is an expert in psychiatry, met with Mother before concluding Mother "had no evidence of serious mental illness" and "should be moved forward with reunification steps with her three children in different manners." *Id.* at 54 (citation to notes of testimony omitted). Following Dr. Joy's testimony, the trial court stated its finding, "while it's clear in my mind and the testimony is immediate and fresh, I give no weight to [Dr. Joy's] testimony regarding her opinion as to Mother's capacity to parent." N.T., 10/13/22, at 126. The court explained that Dr. Joy's opinion was "not something she developed out of information she received other than the one-sided narrative which completely ignored all of the evidence in this case

- 12 -

regarding the violence and Mother's culpability in abuse of [M.T.S.]." *Id.* at 126-27. The court further explained:

> … Dr. Joy reported reviewing the [parental capacity evaluation prepared] by Dr. Russell and records predominately provided by Mother and her attorney. She noted that the criminal records she reviewed were provided through Mother or her counsel rather than through the District Attorney's office. She further noted that various treatment records from JFK Behavioral Health Center and other medical records were all provided by Mother rather than the provider of origin. [Dr. Joy] reviewed various other documents Mother provided that were from Mother's friends, family, or her community. (N.T., 10/13/2022, p.70 at 19-25, pp.71-73 at 1-25).
>
> Dr. Joy testified she did not ask Mother to sign any releases of information so she could obtain records directly from providers. Further, she did not obtain releases from Mother to allow her to communicate with [the] CUA provider, [] obtain DHS records[, ] or [] communicate with the District Attorney's Office. She noted that she did not request additional records from other attorneys involved such as the child advocate [or] the guardian ad litem. Dr. Joy stated [that] to obtain information independently was not the standard she was taught to practice in her field. (N.T., 10/13/2022, p.74 at 2-23, p.75 at 1-15).
>
> Further … Dr. Joy noted she did not review all [c]ourt [o]rders on the dependency cases of all three Children and did not review any transcripts of the child abuse hearing where Dr. Atkinson, a child abuse pediatrician, testified. She reviewed the transcript of Mother's criminal preliminary hearing and did not review the DHS investigation records supporting the child abuse hearing. Dr. Joy testified she did not request any additional documents other than what was provided and documented in her report. She testified she did not develop her conclusions based on the consideration of the findings of fact this [c]ourt made under the Child Protective Services law of abuse in this matter. **In fact[,] the findings of abuse against Mother regarding M.T.S. [] was not specifically considered by Dr. Joy at the time of her report. When questioned about now knowing that a finding of child abuse against Mother was made, Dr. Joy opined that additional information could change her opinion.** However, her substantial conclusions remain the same in her evaluation of Mother's capability of parenting with regard

- 13 -

to the Children, though she would have more hesitation with regard to reunification, timelines and supports. (N.T., 10/13/2022, p.83 at 3-18, p.84 at 1-25. p.85 at 1-17. p.86-87 at 1-25, p. 88 at 1-5).

Trial Court Opinion, 12/20/22, at 55-56 (emphasis added).

The record supports the trial court's findings. *In re Adoption of S.P.,* 47 A.3d at 826-27 (appellate courts must defer to trial judges when factual findings are supported by the record and the trial court's legal conclusions are not the result of error). Thus, the trial court did not abuse its discretion in considering expert testimony and concluding that Mother's continued incapacity to parent has caused the Children to be without essential parental care, and the conditions and causes of the incapacity will not be remedied. *See* 23 Pa.C.S.A. § 2511(a)(2).

## Section 2511(b)

In her second issue, Mother argues the trial court erred in terminating her parental rights under Section 2511(b), which requires the court "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Mother claims "there was no testimony as to whether or not a bond existed between [M]other and [M.T.S.]; and whether M.T.S. would suffer any harm if the parental bond was severed." Mother's Brief at 12. Mother also asserts "there is nothing in the record to indicate the trial court undertook an analysis of the status of a bond between [M]other and [E.R.U.F.] and the impact severing the bond would

have upon E.R.U.F. as required in a 2511(b) analysis." *Id.* at 13.[6]  We are not persuaded by Mother's argument.

"Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007).  When the trial court considers a child's needs and welfare, the "extent of any [parental] bond analysis ... necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 763 (Pa. 2008).  Pertinently,

> in addition to a bond examination, **the trial court can equally emphasize the safety needs of the child**, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.  Additionally, … the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re A.S.*, 11 A.3d at 483 (citations omitted, emphasis added).

Here, the trial court found aggravated circumstances as to M.T.S. on January 6, 2021, and ordered that no efforts be made to reunify M.T.S. with Mother.  On January 25, 2022, the trial court suspended Mother's visits with E.R.U.F. and Z.N.G.  *See Interest of E.F.*, 284 A.3d 956 (Pa. Super. Aug.

---

[6] As to Z.N.G., Mother concedes he was two years old "at the time of trial[, when] the CUA case manager testified that there would be no harm to Z.N.G. if [Mother's] rights were terminated because Z.N.G. has no bond with [Mother]."  Mother's Brief at 12-13 (citing N.T., 10/13/22, at 44).

30, 2022) (unpublished memorandum affirming the orders suspending Mother's visitation with E.R.U.F. and Z.N.G.).

At the termination hearing, CUA case manager Tamika Palmer testified that termination was in Children's best interests, and "no irreparable harm" would result. N.T., 10/13/22, at 34-44. Ms. Palmer testified that M.T.S. and Z.N.G. were in the same placement and doing well. *Id.* at 42-43. Ms. Palmer opined that their bond "is important, given neither parents are involved[.]" *Id.* at 43. Ms. Palmer testified that E.R.U.F. was doing well in her pre-adoptive home where "she has a loving bond" and has "achieved stability." *Id.* at 39-40. Ms. Palmer opined that it would be "harmful" for E.R.U.F. to be removed from the home. *Id.* at 40.

At the conclusion of the termination hearing, the trial court stated that Mother "is a dire threat to the safety of these children." N.T., 10/13/22, at 143. The court concluded "it would be in the best interest of [C]hildren [that] Mother's rights be terminated." *Id.* at 143-44. Our review reveals no abuse of discretion or error by the trial court's termination of Mother's parental rights under Section 2511(b).

### Due Process

Finally, Mother asserts the trial court violated her due process rights by, *inter alia*, denying her request for a continuance and refusing to admit evidence related to her mental health. Mother's Brief at 14. This argument is undeveloped. Mother simply argues "the trial court abused its discretion to

such an extent as to deny the Appellant a fair trial." *Id.* at 15. Mother has waived her due process claims. *See* Pa.R.A.P. 2119; *see also Commonwealth v. Clayton*, 816 A.2d 217 (Pa. 2002) ("[I]t is a well[-]settled principle of appellate jurisprudence that undeveloped claims are waived and unreviewable on appeal.").

In sum, the record and law support the trial court's termination of Mother's parental rights.

Decrees affirmed.

Judge McCaffery joins the memorandum.

Judge Dubow did not participate in the consideration or decision of this case.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/26/2023